# UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JAMIE AVILA, JR., | CV F  04-5479 SMS HC |
| Petitioner, | ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS AND DIRECTING CLERK OF COURT TO ENTER JUDGMENT IN FAVOR OF RESPONDENT |
| v. | |
| JOE McGRATH, Warden, | [Doc. 1] |
| Respondent. | |

Petitioner is a state prisoner proceeding with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254. Petitioner is represented by James Koester, Esq. Pursuant to 28 U.S.C. § 636(c)(1), the parties have consented to the jurisdiction of the United States Magistrate Judge. (Court Docs. 5, 11.)

BACKGROUND

On June 20, 2001, following a jury trial in the Kern County Superior Court, Petitioner was convicted of discharging a firearm at an occupied motor vehicle (Cal. Penal Code, § 246);[1] assault with a firearm (§ 245(a)(2); and permitting another to discharge a firearm from a vehicle he owned, or was driving (§ 12034(b)).[2] (CT 420.)[3] The jury found true the allegation that

---

[1] All further statutory references are to the California Penal Code unless otherwise indicated.

[2] Petitioner was acquitted of Count 2, which charged him with attempted murder (§§ 664/187(a)).

[3] "CT" refers to the Clerk's Transcript on Appeal; "SCT" refers to the Supplemental Clerk's Transcript; "RT" refers to the Reporter's Transcript on Appeal.

1

Petitioner committed the offenses for the benefit of, at the direction of, or in association with a criminal street gang (§ 186.22(b)(4)(B)). After Petitioner waived his right to a jury trial on the prior conviction allegations; the trial court found the allegations to be true. (CT 421, 424-34.)

On July 18, 2001, the trial court denied Petitioner's motion for a new trial pursuant to section 1181. (CT 444-50, 451-55, 476.) The trial court sentenced Petitioner to an indeterminate term of fifteen years to life in count 1, plus two one-year concurrent sentences for each section 667.5(b) enhancement for a total of seventeen years to life. The trial court imposed the upper term of four years plus a five-year enhancement for the gang allegation in count 3, and the upper term of three years plus five years for the gang enhancement in count 4. The sentences in counts 3 and 4 were ordered stayed pursuant to section 654. (CT 482.)

Petitioner filed a timely notice of appeal to the California Court of Appeal for the Fifth Appellate District. On January 29, 2003, the Fifth Appellate District affirmed the judgment of conviction, but the matter was reversed and remanded for resentencing on the prior prison term allegations (667.5(b)). (Respondent's Exhibit 3, attached to Answer.)

On February 11, 2003, the Fifth Appellate District filed a Modification of Opinion that did not affect the judgment. (Respondent's Exhibit 4, attached to Answer.)

On March 4, 2003, Petitioner filed a petition for review to the California Supreme Court. (Respondent's Exhibit 5, attached to Answer.) The petition for review was denied on April 9, 2003. (Respondent's Exhibit 7, attached to Answer.)

Petitioner filed the instant petition for writ of habeas corpus on March 24, 2004. Respondent filed an answer to the petition on July 1, 2004. Petitioner did not file a traverse.

## STATEMENT OF FACTS

Prosecution

The evidence produced at trial established the following: On March 23, 2001,[4] Petitioner loaned his 1997 green Ford Taurus to Saunikka Ford, Rodney Gupton's (Petitioner's co-defendant in underlying trial) girlfriend, who drove and parked the vehicle at the Bombay Club in

---

[4] All further dates are to March 2001, unless otherwise indicated.

2

1  downtown Bakersfield. (RT 1416-17.) Ms. Ford left the vehicle parked while she went inside
2  the club. (RT 1422.) When she returned, Ms. Ford discovered that the vehicle had been shot at.
3  (Id.) She drove it home, parked it in front of her house and reported the incident to the police
4  department. (Id.) The next day Petitioner picked up the car. (RT 1432.)

5        On March 24, Jannette Martin and her friend, Shannon Parker, were driving around
6  Bakersfield in Parker's mother's car, near East California Avenue. (RT 789-91, 867.) Petitioner
7  and Gupton flagged the two down, and got into the backseat of the car. (RT 793.) Ms. Martin
8  knew Petitioner as "Pete." (RT 792.) Petitioner asked to be taken to an Auto Body Shop
9  because his car was there. (RT 795-796.) After Petitioner spoke with someone at the Body
10  Shop, he asked Martin if she would rent him a car. (RT 797.) Martin agreed and rented a gold
11  colored Toyota Solara, with her credit card. (RT 798-799.) Martin identified the vehicle in
12  several photographs shown by the prosecution which depicted a gold colored Toyota Solara with
13  license plate number 4MDC930. (RT 799-800.) Martin and Petitioner drove to a liquor store
14  and met up with Gupton and Parker. (RT 801.) At the liquor store, Martin gave Petitioner the
15  keys to the Solara and told him the car needed to be returned by 10:00 a.m. on Monday morning.
16  She asked that he contact her before then to make arrangements to return the vehicle and she
17  gave him Parker's phone number. (RT 802.) Petitioner and Gupton subsequently drove off in
18  the Solara. (RT 803.)

19        Kieisha Steverson, Lonnie Delaney's girlfriend, testified that Delaney drove his red
20  Intrepid to her home on T street on the evening of March 25. (RT 822, 830.) The two went out
21  to dinner and then returned to her residence. (RT 826-27.) Steverson observed Delaney drive
22  away from her residence down T street, when she noticed a Toyota Solara chase after him. (RT
23  827-28, 831-32.) Steverson observed that Gupton was the passenger in the Toyota. (RT 838.)
24  Steverson knew Gupton because she had attended junior high school with him. (RT 835.) As
25  the Toyota approached Delaney's red Intrepid, Steverson saw Gupton's hand out the passenger
26  window and heard gun shots fired. (RT 839.) At that point, Delaney crashed into a home. (RT
27  840-41.) The Toyota Solara drove away. (RT 840.) Steverson ran down the street to see if
28  Delaney was injured. (RT 840.) Delaney crawled out the driver's side window. (RT 841-42.)

Police arrived at the incident approximately seven minutes later. (RT 842.) Steverson was unable to identify the driver of the vehicle. (RT 848.) The prior evening, Steverson had observed Gupton driving the Toyota Solara by the Hurricane Club with several other individuals inside the car. (RT 833-34.)

Victor Carter was in the front yard of a residence on T street and observed the shooting. (RT 1041-42.) On March 25, between 2:00 and 3:00 p.m., Carter heard two gun shots fired and a ricochet. (RT 1041, 1043.) Carter is familiar with the sound of gunfire as he is retired from the Army. (RT 1042-43.) After hearing the gunshots, Carter walked toward the street and saw two vehicles racing northbound on T street. (RT 1043-44.) The vehicle in front was described as red or maroon, and the second vehicle was yellow or gold and driving on the wrong side of the road, almost adjacent to the first vehicle. (RT 1044.) Carter observed a man hanging out of the window of the gold vehicle firing an automatic weapon. (RT 1044-45.) He fired approximately six to eight shots toward the maroon vehicle. (RT 1045.) After hearing the gun shots, Carter ducked and when he looked back up, the maroon vehicle had crashed into the side of a house on Eleventh Street, and the gold vehicle drove off turning east bound onto California Avenue. (RT 1049.) Carter called 911 and then went to talk to Delaney. (RT 1050.)

At trial, Carter identified Petitioner as the driver of the gold vehicle and Gupton as the person who was leaning out the window firing the gun at Delaney. (RT 1053.) Prior to trial, Carter identified Petitioner out of a six-pack photographic line up as the person who was driving the gold vehicle. (RT 1054.) That same day, he was unable to identify Gupton or any other individual as the shooter. (RT 1055.) However, approximately nine days later, Carter observed a newspaper article containing a photograph of Gupton, and realized that Gupton was the shooter. (RT 1055-57.)

On cross-examination, Carter stated that he had previously mistakenly described the shooter as having long hair. He later corrected the identification to indicate that he remembered that the driver, rather than the shooter, had long hair. (RT 1063.) Six weeks prior to trial, Carter agreed to a taped interview, which was played for the jury. (RT 1066.) During the interview, Carter stated that out of the two, the shooter had the longest hair because it was braided. (SCT

4

3.)

      Officers Don Martin and Claudia Payne responded to the scene of the shooting around 6:00 p.m. (RT 933-34, 941.) Delaney was slightly injured, and refused medical attention. (RT 934-35.) Delaney was uncooperative, and was not forthcoming with his answers to questions. (RT 935.) Officer Martin made contact with Kieisha Steverson who expressed concern about her safety, and did not want anyone to see her, so they went inside her home for the interview. (RT 935-36.) While speaking with Steverson, Officer Martin noticed that she was trembling and constantly looking around to see if anyone was watching her. (RT 936.) Steverson told Officer Martin that Gupton, who was the passenger in the suspect vehicle, had shot at Delaney. (RT 936-37.) When Officer Payne spoke with Steverson on March 26, she was unable to give a description of the driver of the vehicle. (RT 961.)

      Officer Payne was present when the red Intrepid was inspected and searched. (RT 944.) Several items were seized from the vehicle including three spend bullets, a blue baseball hat, a blue bandana and a .22 caliber rifle, with a live round in the chamber. (RT 945.) The first bullet was located in the driver's side rear door, the second in the trunk deck, and the third was in the space between the front seat and the front passenger's door. (RT 945.) "Westside H.O.G.S." was written on the blue baseball cap. (RT 953.)

      Officer Stephen Wilson also responded to the scene of the shooting, and he recognized Delaney from prior contacts. (RT 1137.) Delaney told Officer Wilson that he was driving down T Street when he noticed a yellow gold car approaching behind him. (RT 1139.) Delaney accelerated and made a U-turn. The gold car did the same and then tried to overtake him by driving along the driver's side. (Id.) He then noticed an individual reach out of the car and shoot at him. He ducked because he believed he was going to be hit and then crashed into the house at the intersection. (RT 1139-40.) Delaney indicated that he did not get a good look at the driver and was therefore unable to identify him. (RT 1140.)

      Lonnie Delaney denied any membership of the Westside Crips. (RT 917.) He stated that he knew of Kieisha Steverson, but was not her boyfriend. (RT 908-09.) Delaney stated he went to visit Steverson and when driving down T street, a sports car started to chase him. (RT 812-

14.)  He saw a "little black thing" extended out of the car window.  (RT 916.)  As a result of the incident, Delaney cut his lip.  Delaney did not hear any gunshots because the volume of his music was turned up too loud.  (RT 917.)

Officer Clayton Madden went to Tito's auto body repair shop in Bakersfield on March 26 at 12:00 p.m. to do follow-up investigation regarding the shooting that had occurred the prior day on March 25.  (RT 864-865.)  Officer Madden located Petitioner's 1997 Green Ford Taurus which had a bullet hole through the right-rear door.  (RT 856.)  While Officer Madden was at the Body Shop and in the process of impounding the vehicle, Petitioner voluntarily went in to the shop.  Petitioner told Officer Madden that he had received information from a female that the Westside Crip gang members were responsible for the shooting of his vehicle.  (RT 861.)  Petitioner further stated that he believed gang members with the monikers "Slingshot," "D.R.," and "Squeak" shot at his vehicle, believing that he was inside.  (RT 861, 863.)  Officer Madden later identified "Squeak" as being Delaney; "D.R." and "Slingshot" are Delaney's brothers.  (RT 861.)  Petitioner also told Officer Madden that members of the Westside Crips knew he drove a Green Taurus, and were known to shoot at Eastside Crips.  (RT 863.)

Shaquita Ballard testified that Petitioner and Gupton attended the barbecue at her residence on 4312 Parker Avenue, Unit D, during the afternoon of March 25.  (RT 1094, 1098.)  Ballard had known Petitioner for approximately three years because she was friends with Petitioner's girlfriend, Debra Bryant.  (RT 1095-96.)  Ballard knew Gupton from high school.  (RT 1097.)  Ballard did not know if either Petitioner or Gupton left the barbecue because she did not actually see either of them leave.  (RT 1099.)  Ballard did not remember telling police that the two arrived at the barbecue at approximately 2:00 p.m. and left around 5:00 p.m.  (RT 1099-1100.)  Ballard observed a tan colored Solara at the barbecue, but was not certain if the two men left in it.  She did not remember telling police that the two left in the tan Solara and returned to her apartment between 6:00 and 6:30 p.m.  (RT 1100-01.)  On cross-examination, Ballard acknowledged that she was taking three prescription medications for depression.  (RT 1103.)

Officer Gary Carruesco responded to an apartment building on Parker Street in Bakersfield, and made contact with Shaquita Ballard in Apartment D.  (RT 1142-43.)  Ms.

Ballard told Officer Carruesco that Petitioner and Gupton had arrived at her apartment at approximately 2:00 p.m. for a barbeque driving a tan Toyota Solara. (RT 1144-45.) She stated that the two left at approximately 5:00 p.m. and returned to the Apartment between 6:00 and 6:30 p.m. (RT 1145.) Ms. Ballard told Officer Carruesco that she believed the Toyota Solara had been left in the alley behind her apartment. (RT 1146.) Ms. Ballard indicated that Gupton had telephoned her cell phone at approximately 8:00 p.m. on the 25th. (RT 1147.) The cellular phone was seized as evidence. (RT 1148.) Officer Carruesco and his partner, Officer Guyton, responded to a different location, 5301 Dunsmuir, No. 16, and made contact with Saunikka Ford, and Gupton was located and arrested at that location. (RT 1148-49.)

Petitioner called Shannon Parker on Sunday, March 25 about 6:30 p.m., and told her where she could pick up the Solara off of Acres and Parker. (RT 880.) Parker and a friend went to pick up the vehicle and they saw Petitioner getting out of the driver's side of the car. (RT 881-82.)

Parker called Martin on Monday morning, March 26the, and told her that Petitioner and Gupton had been arrested. (RT 886-87.) Parker drove to Martin's home and picked her up. (RT 806, 888.) When Martin saw the Solara, she was upset because it had been wrecked. (RT 806-07.) The side of the vehicle had a scratch and there was a burn mark in the back seat. (RT 898-99.) When Martin tried to return the rental car, she was informed that the sheriff was looking for her. (RT 808, 888.) Martin was upset and went to the police station where she agreed to a taped interview. (RT 809.) Parker testified that on Saturday, March 24, Gupton's hair was cut very short. (RT 894.)

Officer Joe Dougherty testified that in June of 1999, he made a vehicle stop involving Gupton, wherein a blue baseball style cap was seized. (RT 1202-03.) Mr. Gupton admitted that he belonged to the Mid-City gang, and the initials on the cap, CBK stood for Country Boy Killer and WSK stood for Westside Killer. (RT 1204-05.)

Rebecca Stokes, a crime lab technician at the Bakersfield Police Department, conducted a fingerprint analysis from the Toyota Solara. (RT 1211-12.) She compared all the prints lifted from the vehicle to both Petitioner and co-defendant Gupton. Two fingerprints lifted from the

car matched one of the subjects. (RT 1212.) The first fingerprint lifted from the driver's side rearview mirror was positive to the right middle finger of Petitioner. (Id.) The second latent print lifted from the passenger door was positive to the right palm of Petitioner. (Id.) Ms. Stokes did not check for the presence of gun powder residue in the backseat of the Solara. (RT 1217-18.)

On April 23, 1999, Officer Frank Gonzales searched the residence of Tierre Hester. (RT 1227-28.) During the search, two videotapes were seized, one entitled "Kicking Back At Mattie's House With 'E Niggas.' " (RT 1228.) The videotape was played for the jury. (RT 1230, 1232.) Gupton was seen on the videotape depicting a party involving indications of gang affiliation. (RT 1229, 1231.)

Officer Martin Heredia, testified as a gang expert.[5] Mr. Heredia stated that the Westside and Eastside Crips are rival gangs within the Bakersfield community. (RT 1241-43.) During March of 2001 there were shootings between the two gangs being investigated. (RT 1244.) Officer Heredia identified and knew Lonnie Delaney as being a member of the Westside Crip gang. (RT 1244-46.) Officer Heredia referred to Mr. Delaney's status as an "OG" member. (RT 1246.) "OG" stands for older generation, meaning that the individual has been a member of the gang for a substantial amount of time. (RT 1246.) If a rival gang member "takes out" an OG member from the another gang, that individual earns a "great deal of respect" by other gang members. (RT 1247-48.) Based on past investigations, Mr. Delaney has acted against rival gang members. (RT 1248.)

Officer Heredia also identified and knew Rodney Gupton as "Lou" , and based on his investigation, he was a member of the Eastside Crips. (RT 1249-50.) Officer Heredia based his opinion on reports involving officers' contacts with Gupton wherein gang paraphernalia was seized, admissions that he was a member of the Eastside Crips, or he was in contact with other known Eastside Crip gang members. (RT 1251.) Officer Heredia had previously arrested Gupton, and he admitted he was, in fact, a member of the Eastside Crips. (Id.) Heredia

---

[5] Mr. Heredia testified that he had testified on numerous occasions as a gang expert, involving both Eastside and Westside Crips. (RT 1235.)

identified the tattoos on Gupton as the letters "E and S" on the right forearm, and to the rear of both biceps the number 1 appeared on each side. (Id.) The number 1 signifies Eleventh Street, which is also known as Project Crips and the E and S stand for Eastside. (Id.) The tattoos represent Gupton's membership to the Eastside gang. (RT 1251-52.) With regard to the initials "CBK", it is a derogatory term meaning County Boy Killer, signifying the County Boy Crips another rival gang. (RT 1253.)

Officer Heredia reviewed the videotape confiscated from the home of Tierre Hester. Officer Heredia had made contact with Tierre Hester on several occasions and he had admitted to being a member of the Eastside Crips. (RT 1282-83.) Officer Heredia identified Gupton in the videotape, and it appeared that he was doing a large portion of the videotaping. (RT 1283, 1285.) During various times throughout the video, the subjects in the video would display gang affiliation signs signaling membership to the Eastside Crip gang. (RT 1285.) Specifically, at one point in the video, Gupton jumped in front of the camera and "threw a sign which stood for Eastside Crips." (Id.) At another point in the video, Tierre Hester demonstrated his affiliation with the Eastside Crips by displaying his pistol finger toward the Westside Crip symbol. (RT 1287.) Gupton subsequently pointed his gun finger at the Westside Crip symbol, depicting his hatred for that gang. (RT 1288.)

Officer Heredia identified Petitioner by the moniker "Pete." (RT 1289.) Based on Officer Heredia's prior contacts with Petitioner and various reports, Petitioner was also a member of the Eastside Crips. (RT 1289-1290, 1293.) Officer Heredia identified Petitioner as an "OG" member. (RT 1294.) Officer Heredia identified Petitioner's tattoos as a S on the left-rear bicep and the letter G on the right-rear bicep, which signifies "Spoonie G." (RT 1290.) Three photographs were shown to Officer Heredia. (RT 1290.) In each of the photographs, Petitioner was standing among other known Eastside gang members, who were displaying the signs E and C with their fingers. (RT 1292.)

Based on Officer Heredia's investigation in this case, it was his opinion that Petitioner and Gupton committed the drive-by shooting on Delaney (a member of the Westside Crips) because they believed he had shot at Petitioner's car the prior evening. (RT 1294-95.) Officer

Heredia further opined that Petitioner and Gupton committed the shooting in furtherance of the criminal street gang, the Eastside Crips. (RT 1301-02, 1331-32.) It is a common practice for gang members to use rental cars when committing a drive- by shooting to foil a police investigation. (RT 1297.) It was discovered during the investigation that Petitioner was being pursued by rival Westside gang members. (RT 1295.) Officer Heredia opined that rival gang members often times retaliate with the same or greater magnitude. (RT 1300.) In fact, if the initial victim does not retaliate against the rival gang, it demonstrates a sign of weakness and the member would suffer some type of ridicule from the gang itself. (RT 1301.) It is common in gang related cases for witnesses living in gang related areas to be reluctant to go to court and testify in fear of retaliation. (RT 1299.)

It was stipulated at trial that the Eastside and Westside Crips are criminal street gangs within the definition of Penal Code section 186.22, subdivisions (e) and (f). (RT 1350.) It was also stipulated that on March 25 during the evening hours, Petitioner was contacted and a photograph was seized from his wallet, and Petitioner was arrested on March 26. (RT 1352.)

During the booking process, Petitioner informed Officer Carruesco he was a member of the Eastside Crips, and wanted to be kept away from Blood gang members. (RT 1198.) Petitioner had a tattoo of a "S" and a "G" on the back of his arms, signifying Spoonie G, a subset of the Eastside Crip gang. (RT 1198.)

Defense

The defense called Psychiatrist, Shanti Keshava, who testified that Shaquita Ballard is one of her patients, and she was diagnosed with major depression and posttraumatic stress disorder. (RT 1259.) Beginning in November 2000, Ms. Ballard was seen six times by Keshava and was treated with Paxil, Zyprexa, and BuSpar. (RT 1262.) Ms. Ballard appeared to be responding to the medication. (Id.) However, a big portion of the treatment comes from counseling. (RT 1263.) In situations where Ms. Ballard is under a lot of stress, such as being interviewed by police officers, her condition could become exacerbated, causing tremendous psychological distress. (RT 1262-63.) Under such circumstances, Ms. Ballard could become confused when asked a compound question; therefore, any questions posed to her would need to

1   be simple and asked slowly and clearly. (RT 1264.) For a two to three week period, Ms. Ballard
2   ran out of medication, at which time she reported a reoccurrence of symptoms including crying
3   spells, hearing voices, increased anxiety and agitation, and sleep disturbance. (RT 1265-66.)
4   However, Ms. Ballard resumed taking her medication on March 7 and would have had the full
5   effects of the medication by March 25. (RT 1266.)

6   MaryAnn Bryant, Debra Bryant's (Petitioner's girlfriend's) mother, was Ballard's
7   landlord. (RT 1362.) She testified that on March 25th, at approximately 7:00 p.m., police went to
8   her apartment and spoke with her regarding the barbecue at the apartment complex. (RT 1363.)
9   Ms. Bryant told the officers that she did not know Rodney Gupton, but she knew Petitioner as he
10  was her daughter's boyfriend. (RT 1364-65.) Ms. Bryant indicated that Petitioner had helped
11  her move some furniture in her house that night. (RT 1365.) She first saw Petitioner between
12  5:30 and 5:40 p.m. (RT 1375.) Ms. Bryant observed Petitioner at the barbecue at Ballard's
13  apartment. (RT 1371.) Petitioner left with Debra Bryant, her children, and Yvette sometime
14  before 7:00 p.m. (RT 1366.)

15  Tangela Bryant, Debra Bryant's cousin, attended the barbecue on the 25th. (RT 1380.)
16  She rode with Petitioner and Debra Bryant to the barbecue in Debra's gray Cadillac. (RT 1381.)
17  She remained at the barbecue until about 8:00 or 9:00 when she left with Petitioner. (RT 1382,
18  1384.) Petitioner was preparing the food at the barbecue; they ate around 5:30 p.m., and
19  Petitioner was there at that time. (RT 1382-83.) Prior to leaving between 8:00 and 9:00, she did
20  not see Petitioner leave the barbecue. (RT 1384.) On the day of the barbecue, Petitioner's hair
21  was the same as it was at trial, pulled straight back into a pony tail on the back of his head. (RT
22  1384-85.) The individuals attending the barbecue watched movies throughout the day. (RT
23  1385.) Tangela remembered that after eating dinner, Petitioner was at the barbecue playing with
24  his daughter. (RT 1385.)

25  Debra Bryant, Petitioner's girlfriend, has a child with Petitioner. (RT 1391.) Petitioner
26  picked up Debra from his mother's house, then drove to pick up Tangela before going to the
27  barbecue. (RT 1393.) Petitioner and Debra left the barbecue in the early afternoon to pick up
28  Monique. (RT 1393.) When they returned to the barbecue, Petitioner began preparing the food.

1  (RT 1394.) After they ate, Petitioner watched a movie inside the apartment. (Id.) Petitioner was
2  present at the barbecue when Debra's mother, MaryAnn Bryant, arrived home from church
3  around 5:40 p.m. (RT 1396.) Petitioner left the barbecue just after 8:00 p.m., with Debra, her
4  two children, Tangela, and Monique, in her car. (RT 1397.) Petitioner did not leave the
5  apartment between 3:00 and 8:00 p.m. (RT 1399.)

6  Debra Bryant testified that Rodney Gupton was also at the barbecue on the 25th. (RT
7  1401.) Gupton had a short, bald, fade-type hair cut on the day of the barbecue. (RT 1401.)
8  Gupton left the barbecue before Debra. (RT 1404.) Debra did not tell Officer Payne that she was
9  unsure how Petitioner arrived at the barbecue. (RT 1407.)

10  Gupton and his girlfriend, Saunikka Ford, left the barbecue together and drove to Ford's
11  apartment. (RT 1412-13, 1415.) Gupton was arrested later that evening in her apartment. (RT
12  1413.) As Gupton was being arrested, he yelled, "If you guys think I did anything, test me for
13  gun powder." (RT 1415.) Two photographs were seized from Ford's apartment and introduced
14  by the prosecution at trial, People's Exhibits 26-A and 26-B. (RT 1416.) Ford did not consider
15  Gupton to be a member of the Eastside Crips. (Id.) he did acknowledge that he had been a
16  member of that gang in the past. (RT 1425, 1428.) Ms. Ford did not remember telling Officer
17  Payne that it was possible that Gupton could have left the barbecue prior to 7:00 p.m. (RT 1420.)

19  Grinnell Giffen, a defense investigator, went to Ballard's apartment and videotaped the
20  surroundings. (RT 1460-61.) The videotape was played for the jury. (RT 1461.)

21  Rodney Gupton's mother, Annette Davis, testified that on March 25th, an officer went to
22  her home looking for Rodney indicating that he was a suspect in a shooting. (RT 1471.)
23  Between 7:00 and 8:00 p.m., Ms. Davis spoke to Rodney on the telephone and told him the
24  police were looking for him. (RT 1472-1474.)

25  Officer Heredia acknowledged that no testing for gun powder residue was performed on
26  Gupton's clothing that was seized from Saunikka Ford's residence. (RT 1476-1477.)

27  Prosecution Rebuttal

28  Officer Matthew Peery, at the prosecution's request, drove from the intersection facing

1  northbound on Eleventh and T streets, the site of the shooting to Ballard's apartment.  (RT 1516-
2  17.)  Driving the speed limit, it took him nine minutes and forty-five seconds,  and the distance
3  was 5.2 miles.  This time included stopping at all necessary traffic lights.  (RT 1517-18.)

4  Officer Guyton went to Ballard's residence on the evening of the 25th.  (RT 1520.)  While
5  searching the residence with her permission, a cellular phone was located.  (RT 1521.)  The last
6  number to have been called on the cellular phone was Saunikka Ford's residence.  (RT 1523.)
7  During the conversation with Ms. Ballard, she told officer Guyton that Petitioner and Gupton had
8  arrived at the barbecue at approximately 2:00 p.m. and left around 5:00 in a tan car and returned
9  around 6:00 or 6:30.  (RT 1527-28.)  Ms. Ballard said she believed they left the tan Toyota
10 Solara in the alley, but was not for sure.  (RT 1529.)  MaryAnn Bryant told Officer Guyton that
11 Petitioner left with her daughter in a Cadillac.  (RT 1533.)

12 Gregory Laskowski, the supervising criminalist from the Kern County Regional
13 Criminalistics Laboratory, testified as a ballistics expert.  (RT 1542-43.)  Mr. Laskowski stated
14 that if an individual is involved in a shooting, testing should be performed within two to three
15 hours of the shooting incident, and the individual should not have engaged in a lot of physical
16 activity, cleaned up or manipulated any other materials from the time of the shooting.  (RT
17 1545.)  This type of testing is not done by Kern County, the California Department of Justice or
18 the Federal Bureau of Investigations.  (RT 1544.)  Mr. Laskowski opined that agencies dropped
19 this type of testing due to the "relatively nebulous" results.  (Id.)  He further opined that the
20 absence of gunpowder residue does not necessarily mean that the individual did not discharge a
21 firearm.  (RT 1547-48.)

22 Officer Heredia interviewed Jannette Martin on March 25.  (RT 1564.)  Martin told him
23 that Parker called her between 5:30 and 6:00 p.m. to tell her she had already recovered the
24 vehicle from Petitioner.  (RT 1564.)  Parker further stated that the vehicle was recovered from an
25 alley somewhere on Parker Avenue.  (RT 1565.)

26                                              DISCUSSION
27 A.    Jurisdiction
28     Relief by way of a petition for writ of habeas corpus extends to a person in custody

pursuant to the judgment of a state court if the custody is in violation of the Constitution or laws or treaties of the United States. 28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); Williams v. Taylor, 529 U.S. 362, 375, 120 S.Ct. 1495, 1504, n.7 (2000). Petitioner asserts that he suffered violations of his rights as guaranteed by the U.S. Constitution. The challenged conviction arises out of the Kern County Superior Court, which is located within the jurisdiction of this Court. 28 U.S.C. § 2254(a); 2241(d).

On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its enactment. Lindh v. Murphy, 521 U.S. 320, 117 S.Ct. 2059, 2063 (1997; Jeffries v. Wood, 114 F.3d 1484, 1499 (9th Cir. 1997), *cert. denied,* 522 U.S. 1008, 118 S.Ct. 586 (1997) (quoting Drinkard v. Johnson, 97 F.3d 751, 769 (5th Cir.1996), *cert. denied,* 520 U.S. 1107, 117 S.Ct. 1114 (1997), *overruled on other grounds by* Lindh v. Murphy, 521 U.S. 320, 117 S.Ct. 2059 (1997) (holding AEDPA only applicable to cases filed after statute's enactment). The instant petition was filed after the enactment of the AEDPA and is therefore governed by its provisions.

B.     Standard of Review

This Court may entertain a petition for writ of habeas corpus "on behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a).

The AEDPA altered the standard of review that a federal habeas court must apply with respect to a state prisoner's claim that was adjudicated on the merits in state court. Williams v. Taylor, 120 S.Ct. 1495, 1518-23 (2000). Under the AEDPA, an application for habeas corpus will not be granted unless the adjudication of the claim "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States;" or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State Court proceeding." 28 U.S.C. § 2254(d); Lockyer v. Andrade,123 S.Ct.1166 (2003) (disapproving of the Ninth Circuit's approach in Van Tran v. Lindsey, 212 F.3d 1143 (9th Cir. 2000)); Williams v. Taylor, 120 S.Ct. 1495, 1523 (2000). "A federal habeas court may not issue the writ simply

because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." Lockyer, at 1175 (citations omitted). "Rather, that application must be objectively unreasonable." Id. (citations omitted).

While habeas corpus relief is an important instrument to assure that individuals are constitutionally protected, Barefoot v. Estelle, 463 U.S. 880, 887, 103 S.Ct. 3383, 3391-3392 (1983); Harris v. Nelson, 394 U.S. 286, 290, 89 S.Ct. 1082, 1086 (1969), direct review of a criminal conviction is the primary method for a petitioner to challenge that conviction. Brecht v. Abrahamson, 507 U.S. 619, 633, 113 S.Ct. 1710, 1719 (1993). In addition, the state court's factual determinations must be presumed correct, and the federal court must accept all factual findings made by the state court unless the petitioner can rebut "the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1); Purkett v. Elem, 514 U.S. 765, 115 S.Ct. 1769 (1995); Thompson v. Keohane, 516 U.S. 99, 116 S.Ct. 457 (1995); Langford v. Day, 110 F.3d 1380, 1388 (9th Cir. 1997).

C.    Insufficient Evidence in Support of Street Gang Enhancement

Petitioner contends that there was no evidence of a gang motive involved in the shooting. More specifically, Petitioner contends that the victim shot at his automobile a couple days prior to the shooting. The victim and Petitioner were rival gang members and based on these facts, the gang expert opined that the shooting was in gang retaliation with the specific intent to benefit Petitioner's gang. (Petition, at 5.)

The law on insufficiency of the evidence claim is clearly established. The United States Supreme Court has held that when reviewing an insufficiency of the evidence claim on habeas, a federal court must determine whether, viewing the evidence and the inferences to be drawn from it in the light most favorable to the prosecution, any rational trier of fact could find the essential elements of the crime beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 319 (1979). Sufficiency claims are judged by the elements defined by state law. Id. at 324, n. 16.

Initially, the Court notes that Petitioner challenges only the sufficiency of the evidence as it relates to the street gang enhancement pursuant to section 186.22. As Respondent correctly sets forth in his answer, section 186.22 is part of the "California Street Terrorism Enforcement

and Prevention Act," a statute enacted in response to "a state of crisis which has been caused by violent street gangs whose members threaten, terrorize, and commit a magnitude of crimes against the peaceful citizens of their neighborhoods." § 186.21. Under California law, section 186.22(b)(4)(B), provides for a minimum fifteen-year sentence when a defendant commits a charged felony that is punishable by a life sentence for the benefit of a criminal street gang. For the sentencing provisions of section 186.22(b)(4) to apply, the prosecution must prove, among other things, that the alleged gang has as one of its "primary activities" the commission of one or more enumerated crimes, including discharging a firearm from a car (§ 186.22(e)(6)). Proof of a defendant's participation in the gang's "primary activities" may be shown by expert testimony or by evidence that the gang members have consistently and repeatedly committed criminal activity listed in the gang statute. People v. Sengpadychith, 26 Cal.4th 316, 323-24 (2001).

As previously noted, the parties stipulated at trial that the Eastside and Westside Crips were criminal street gangs within the meaning of section 186.22(e) and (f).

In rejecting Petitioner's claim, the Fifth District Court of Appeal, stated in part:[6]

> "[I]t is reasonable to suppose under the present circumstances that the act to be avenged was itself gang-related. Somebody shot up [Petitioner's] car, which he had loaned to Gupton's girlfriend. [Petitioner] and Gupton are both active members of the Eastside Crips. [Petitioner] believed the shooting was the work of the Westside Crips, with whom the Eastside Crips maintained an ongoing rivalry, and he suspected Delaney and his brothers (who were Westside Crips) were responsible. Thus, [Petitioner] himself apparently thought the shooting was gang-related. It follows the shooting against Delaney, to the extent it was committed in retaliation, likewise was motivated by gang considerations. [Citation.]
> This explanation need not overlook the fact that [Petitioner] and/or Gupton also might have had a personal motivation to retaliate against Delaney. Undoubtedly they did. But we do not read the statute to require that the underlying crime must have been committed exclusively for the benefit of a criminal street gang. If that were the case, no one could be found to have committed a gang-motivated crime who harbored any personal animosity toward the victim.

---

[6] Because the California Supreme Court's opinion is summary in nature, this Court "looks through" that decision and presumes it adopted the reasoning of the California Court of Appeal, the last state court to have issued a reasoned opinion. See Ylst v. Nunnemaker, 501 U.S. 797, 804-05 & n. 3, 111 S.Ct. 2590, 115 L.Ed.2d 706 (1991) (establishing, on habeas review, "look through" presumption that higher court agrees with lower court's reasoning where former affirms latter without discussion); see also LaJoie v. Thompson, 217 F.3d 663, 669 n. 7 (9th Cir.2000) (holding federal courts look to last reasoned state court opinion in determining whether state court's rejection of petitioner's claims was contrary to or an unreasonable application of federal law under § 2254(d)(1)).

(Exhibit 3, at 11, attached to Answer.)

As the state courts found, sufficient evidence supports the jury's finding that the shooting was done with the intent to promote criminal conduct of the Eastside Crips gang. At trial, there was evidence the victim of the shooting, Lonnie Delaney, was a member of the Westside Crips. (RT 861, 953, 1198, 1244-46.) Petitioner told Officer Madden that he was informed that the Westside Crips were responsible for shooting his vehicle, two days prior to the shooting of Delaney's vehicle. (RT 861.) More specifically, members with the monikers "Slingshot," "D.R.," and "Squeak" were responsible. (RT 861, 863.) Delaney was identified as being "Squeak." (RT 861.) Petitioner also told Officer Madden that members of the Westside Crips knew he drove a Green Taurus and were known to shoot at Eastside Crips. (RT 863.) When Petitioner was being booked into jail, he informed Officer Carruesco that he was a member of the Eastside Crips. (RT 1198.) Petitioner has a tattoo of "S" and "G," signifying "Spoonie G, a subset of the Eastside Crip gang. (RT 1198.) There were photographs of Petitioner standing among other known Eastside gang members, who were displaying the signs E and C with their fingers. (RT 1292.)

As Respondent correctly submits, Officer Heredia, who provided expert testimony on street gangs, opined that Petitioner and Gupton committed the drive-by shooting on Delaney because they believed that he shot at Petitioner's car. (RT 1294-95.) He testified that when there is a gang-related shooting, the retaliation is of the same or greater magnitude. He further stated that it was ". . . almost inherent that the gang that is initially the victim has to retaliate." The failure of a gang member to retaliate is a sign of weakness and may subject that member to ridicule from within his own gang. (RT 1301.) It was Officer Heredia's opinion that Petitioner and Gupton were "O.G." status members of the Eastside Crips and committed the drive-by shooting in furtherance of their affiliation with that gang. (RT 1301-02; 1331-32.)

Based on the foregoing, there was sufficient evidence to support the jury's finding that Petitioner was a member of the Eastside Crip gang and that the shooting was done with the intent to promote criminal conduct by the Eastside Crips. The state courts' determination of this issue was not contrary to, or an unreasonable application of, clearly established Supreme Court

precedent.

D.   <u>Instructional Error</u>

Petitioner contends that the trial court erred by instructing the jury with the language in CALJIC No. 17.41.1, which directs jurors to report to the court any fellow juror who is refusing to deliberate. Petitioner contends that this instruction intrudes on his right to an independent and impartial jury.

A challenge to a jury instruction solely as an error under state law does not state a claim cognizable in a federal habeas corpus action. <u>See</u> <u>Estelle v. McGuire</u>, 502 U.S. 62, 71-72 (1991). To obtain federal collateral relief for errors in the jury charge, a petitioner must show that the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process. <u>See</u> <u>id</u>. at 72. Additionally, the instruction may not be judged in artificial isolation, but must be considered in the context of the instructions as a whole and the trial record. <u>Id</u>. The court must evaluate jury instructions in the context of the overall charge to the jury as a component of the entire trial process. <u>See</u> <u>United States v. Frady</u>, 456 U.S. 152, 169 (1982) (citing <u>Henderson v. Kibbe</u>, 431 U.S. 145, 154 (1977)). Furthermore, even if it is determined that the instruction violated the petitioner's right to due process, a petitioner can only obtain relief if the unconstitutional instruction had a substantial influence on the conviction and thereby resulted in actual prejudice under <u>Brecht v. Abrahamson</u>, 507 U.S. 619, 637, 113 S.Ct. 1710 (1993) (whether the error had a substantial and injurious effect or influence in determining the jury's verdict.). <u>See</u> <u>Hanna v. Riveland</u>, 87 F.3d 1034, 1039 (9th Cir. 1996). The burden of demonstrating that an erroneous instruction was so prejudicial that it will support a collateral attack on the constitutional validity of a state court's judgment is even greater than the showing required to establish plain error on direct appeal. <u>Id</u>.

In rejecting Petitioner's claim on direct appeal, the Court of Appeal relied on the California Supreme Court's decision in <u>People v. Engelman</u>, 28 Cal.4th 436, 449 (2002), which

1  rejected Petitioner's identical argument.[7] (Respondent's Exhibit 3, attached to Answer.)

In Brewer v. Hall, 378 F.3d 952, 955-56 (9th Cir. 2004), *cert. denied*, 543 U.S. 1037 (2004), the Ninth Circuit Court of Appeals held that AEDPA precluded an identical due process challenge to CALJIC No. 17.41.1 because there is no Supreme Court case establishing that an instruction such as CALJIC 17.41.1 violates a clearly established constitutional right. To date, the Supreme Court has not addressed a challenge to CALJIC No. 17.4.1 or a similar instruction. Therefore, pursuant to 28 U.S.C. § 2254(d)(1) and Brewer, Petitioner's claim fails on the merits.

## ORDER

Based on the foregoing, it is HEREBY ORDERED that:

1. The petition for writ of habeas corpus is DENIED; and
2. The Clerk of Court is directed to enter judgment in favor of Respondent.

IT IS SO ORDERED.

Dated:    **April 11, 2006**              /s/ Sandra M. Snyder
icido3                                    UNITED STATES MAGISTRATE JUDGE

---

[7] In People v. Engelman, the California Supreme Court concluded that CALJIC 17.41.1 "has the potential to lead members of potentially coercive exploration of the subject matter of deliberations. The California Supreme Court, however, discontinued the use of CALJIC 17.41.1 only in future cases, based solely on its supervisory authority over lower California courts. It did not find that the instruction violated an established constitutional right; indeed, it explicitly stated that no such constitutional violation resulted from the instruction." Brewer v. Hall, 378 F.3d 952, 957 (9th Cir. 2004) (citing People v. Engelman, 28 Cal.4th 436.)